**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| PATRICIA ANN HORTON, *et al.*, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 5:66-cv-0445-RDP |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE COUNTY BOARD | ) | |
| OF EDUCATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**BRIEF OF LAWRENCE COUNTY BOARD OF EDUCATION**
**IN SUPPORT OF THE MOTION FOR APPROVAL OF SCHOOL CLOSURE**
**AND MODIFICATION OF ATTENDANCE ZONES**

This Brief is filed in support of the Lawrence County Board of Education's (hereinafter, the "Board" or "District") Motion seeking the Court's approval of the Board's plan to close R.A. Hubbard High School ("RAH") and corresponding changes to the Board's student attendance boundaries. The Board's Motion was filed as part of the Board's continuing efforts to comply with its constitutional obligation to desegregate its schools and eliminate the vestiges of past discrimination to the extent practicable. See Holton v. City of Thomasville Sch. Dist., 425 F.3d 1326, 1336-39 (11th Cir. 2005). The Board's Motion does not seek unitary status as to any of the factors listed in Green v. County School Board of New Kent County, Virginia, 391 U.S. 430 (1968).[1] Instead, the Board's Motion is narrow in focus, seeking only the Court's approval of the Board's plan to close RAH and modify its student attendance zone boundaries. Below, the Board has provided the Court with background information, relevant case history, an explanation of the legal standard, and legal arguments in support of the Board's Motion.

---

[1] The Board has not achieved unitary status in any of the factors listed in Green.

# I.  BACKGROUND

### A.  Schools Operated by the District

The Board operates twelve schools that serve various grade configurations. (Smith Aff., ¶¶ 6-13). Of those twelve schools, the Board operates four high schools and two middle schools: Hatton High School (Grades 7-12), East Lawrence High School (Grades 9-12), East Lawrence Middle School (Grades 6-8), Lawrence County High School (Grades 8-12), Moulton Middle School (Grades 6-8), and RAH (Grades 7-12). (Id. at ¶¶ 7-11). Additionally, the Board operates the Judy Jester Learning Center, which provides services to "at risk" students, and the Lawrence County Career Technical Center, which provides career technical services to students from all of the high schools. (Id. at ¶¶ 12-13). The Board proposes closing RAH and rezoning those students to Hatton High School, East Lawrence High School, and East Lawrence Middle School. (Id. at ¶ 5).

### B.  Relevant Case History

The Board has been under the continuing supervision of the Court since this Court's first Order entered on September 22, 1966. (See Doc. 001-3). The Order mandated that the Board cease operating a dual public school system based on race. (Id.). The Order required the Board to provide equal educational opportunities to all students without regard to race. (Id.).

On June 12, 1970, the Court entered what is commonly referred to as a Singleton[2] Order implementing a plan to disestablish the former dual system of education. (See Doc. 001-14). The Court's Order created a majority-to-minority transfer process and prohibited the Board from consenting to out-of-district transfers "where the cumulative effect will reduce desegregation in either district or reinforce the dual school system." (Id. at 6-7). Importantly, regarding school consolidation, the Court's Order required that such decisions "shall be done in a manner which

---

[2] See Singleton v. Jackson Municipal Separate Sch. Dist., 419 F.2d 1211, 1217 (5th Cir. 1969)

will prevent the recurrence of the dual school structure once this desegregation plan is implemented." (Id. at 7). In December 1970, the Court entered an Order finding that the Board had "totally defaulted" in its obligations by creating a freedom of choice type assignment plan that resulted in racially identifiable schools contrary to representations made by the Board to the Court. (See Doc. 001-18, p. 2-4).

In August of 1977, after a Motion to Intervene by certain residents in Lawrence County, the Court entered "Findings of Fact and Conclusions of Law" which analyzed the Board's operation of one-race schools in the county, the Board's allocation of resources, and evidence of intentional discrimination by the Board since 1970. (See Doc. 001-49). Regarding allegations of intentional discrimination, the Court found that "the defendant school board in recent years has faithfully complied with the desegregation order respecting student attendance." (Id. at 4). The Court found no evidence of intentional discrimination by the Board and no evidence showing discrimination in "educational facilities and programs." (Id.). In its conclusions of law, the Court determined that the Board had "faithfully complied with the orders of this Court." (Id. at 5). This Order represented a significant positive step towards desegregation and provided evidence of the Board's attempts to reestablish good faith after its failures in 1970.

In its findings, the Court discussed the Board's struggles in the area of student assignment. The Court noted that the Board had always operated three schools (East Lawrence Elementary, Hatton Elementary, and Hatton High) that were "attended exclusively by whites." (Id. at 2). The Court noted that "East Lawrence school is an all-white school owing to the residential patterns in Lawrence County" and "the evidence abundantly establishes that blacks have never lived in the Hatton area." (Id. at 2-3). The Court also found that the Board also

operated three predominately Black schools (Courtland Elementary, Courtland High, and Tennessee Valley Elementary). (Id.). The Court determined that:

> the continued existence of the three all-white schools in the County system is predicated on existing residential patterns, not on racial considerations. All of the formerly black schools in the system have been desegregated; and the predominance of blacks at the Courtland and Tennessee Valley schools is attributable solely to the residential patterns of the county.

(Id. at 3).

Between 1977 and 1991, the Board is not aware of any pleadings relevant to the Board's pending Motion. In August of 1991, the Board sought approval to close Tennessee Valley Elementary School. (See Doc. 001-55). Similar to this brief, the Board argued that the facility was outdated, operating the school was economically inefficient due to low student population (serving 60 total students), and that the low enrollment resulted in academically inadequate offerings. (Id. at 2-3). The Private Plaintiffs supported the Board's plan. (Doc. 001-56). The Court approved the closure of Tennessee Valley Elementary School just days after the Board's Motion. (Id.).

Almost ten years later, the Board requested this Court's approval of a plan to consolidate Courtland High School into the campus of RAH to create a single K-12 campus at RAH. (See Doc. 001-57, p. 1). The Private Plaintiffs objected to the plan, accused the Board of failing to serve Plaintiffs with the Board's request to the Court, and alleged that the Board had provided Private Plaintiffs misleading information. (See Doc. 001-57). The Board argued that consolidating Courtland High School and RAH Elementary would save money and better utilize existing resources. (Doc. 001-69, p. 1). The Board also pointed out the declining enrollment of the two schools. (Doc. 001-61, p. 1-2). After an exchange of pleadings and arguments (See Docs. 001-57, 001-61, 001-62, 001-63), the Court ordered the parties to complete limited discovery and

attempt to resolve outstanding issues. (Doc. 001-64). Ultimately, after additional briefing by the parties (See Docs. 001-65; 001-69; 001-70; 001-71), the Parties were able to resolve their differences, with the Board filing a Motion to Adopt the Mediated Agreement in February 2004. (Doc. 001-75). That same month, the Court adopted the mediation agreement and approved the Board's consolidation of Courtland High and RAH Elementary on the campus of RAH beginning with the 2004-2005 academic year. (Doc. 001-77).

In 2009, facing a financial crisis caused by proration in the Alabama education budget, the Board was once again forced to consider consolidation and realignment of schools. (See Doc 01-103, p. 1; see also Joint Report, March 23, 2009, ¶ 2-4). The Board and Private Plaintiffs were able to reach agreement on a way forward. (See Joint Report, March 23, 2009). The joint plan resulted in the following student assignment changes:

- Hazlewood High School was closed. Students in grades 9-12 that attended Hazlewood High School were rezoned for R.A. Hubbard High School. Hazlewood Elementary School's grade configuration was modified to serve students in grades K-8.
- Mt. Hope school's grade configuration was changed from serving students K-12 to only serving students in grades K-8. Students in grades 9-12 that previously attended Mt. Hope High School were rezoned to Hatton High School.
- Speake school's grade configuration was changed from serving students K-12 to only serving students in grades K-8. Students in grades 9-12 that previously attended Speake High School were rezoned to Lawrence County High School.

(Id. at ¶¶ 6-11). The 2009 Joint Report also created desegregation obligations related to attendance zone compliance, student transfers, faculty, staff, transportation, facilities, extracurricular activities, and curriculum. (Id. at ¶¶ 6-34). The 2009 Joint Report contained specific requirements related to improving the facilities at RAH and conducting a feasibility study for a new "West Lawrence High School." (Id. at ¶¶ 28-31). In May 2009, this Court approved the 2009 Joint Plan proposed by the parties. (Memorandum Opinion, May 8, 2009). The Court stated the following:

Further, as indicated by both the Joint Report and the parties' briefs, the present consolidation efforts are a steppingstone toward consolidating all of the high schools in the western part of the county into a new West Lawrence High School. The parties have indicated (and at present the court agrees) that until such a school is created, it will be extremely difficult (if not impossible) for the Board to seek unitary status with respect to student assignment. The parties are strongly encouraged to take whatever steps are necessary toward achieving that long term goal.

(Id. at p. 22).

In 2012, both the Private Plaintiffs and Board filed status reports with the Court. (See Doc. 18; Doc. 19). The Private Plaintiffs raised concerns regarding the Board's proposal to demolish and replace a dilapidated building on the campus of Hatton High School. (Doc. 19, pp. 2-6). Additionally, the Private Plaintiffs raised concerns regarding the Board's compliance with its obligations under the 2009 Joint Report related to RAH. (Doc. 19, pp. 6-12). The Board explained its proposal related to facilities on the campus of Hatton High School and addressed its compliance with its desegregation obligations. (See Doc. 18). To help the Court understand the state of its compliance, the Board provided the Court a paragraph-by-paragraph update on its compliance with is desegregation obligations. (Doc. 18, pp. 5-10). No additional action was taken after the filing of the status reports from both parties.

Today, the Board files an opposed Motion seeking to close RAH and implement corresponding student assignment modifications.

### C. The Board's Desegregation Obligations Related to School Closures and Consolidations

The Board's current desegregation obligations originate from this Court's 1966 and 1970 Orders. (See Docs. 001-3; 001-14). Beyond those two Orders, the Court has entered three additional Orders that place obligations on the Board: 1.) 2004 Mediated Agreement (Doc. 001-77); 2.) 2007 Order regarding faculty and staff (Doc. 001-92); and 3.) 2009 Joint Report (Joint

Report, March 23, 2009; <u>see also</u> Memorandum Opinion, May 8, 2009). The below summary will not discuss all of the Board's desegregation obligations. Instead, the below will focus on this Court's 1970 Order and the 2009 Joint Report in an effort to narrow the focus to obligations related to school closures, school consolidations, and RAH.

This Court's 1970 Order required the Board to permit "a student attending a school in which his race is in the majority to choose to attend another school where space is available and where his race is in the minority." (Doc. 001-14, p. 6). The Board continues to allow majority-to-minority transfers consistent with the 1970 Order. Regarding school construction and consolidation, the 1970 Order stated that such actions "shall be done in a manner which will prevent the recurrence of the dual school structure." (<u>Id.</u> at 7).

The 2009 Joint Report created requirements for the Board related to student assignment, student transfers, transportation, extracurricular activities, and curriculum. (Joint Report, March 23, 2009). In the 2009 Joint Report, the Board agreed that every student would be required to attend school in the correct attendance zone. (<u>Id.</u> at ¶ 12). To accomplish this, the Board agreed to verify the residence of certain high school students by the end of 2009. (<u>Id.</u> at ¶ 12a-b). The Board also agreed to establish a "mechanism for uniform enforcement of attendance zone boundaries" that would be implemented "in the 2010-2011 academic year, and there forth." (<u>Id.</u> at ¶ 12e). Additionally, the Board agreed to verify the residence of 5% of its students (randomly selected) at each school prior to September 30 of each year. (<u>Id.</u>).

Regarding student transfers, the Board and Private Plaintiffs agreed to a "Student Mobility Policy" that was to take effect in the 2009-2010 school year and was to remain in effect until dissolved or modified. (<u>Id.</u> at 28-32). The Student Mobility Policy lays out procedures for

administrative transfers, transfers for children of school-based employees, majority-to-minority transfers, hardship transfers, and out-of-district transfers. (Id. at 30-32).

Regarding transportation, the Board agreed to "provide free bus transportation from the door of each student's residence to the appropriate school within their assigned attendance zone." (Id. at ¶ 20). The Board's transportation services were to be provided "in accordance with the Alabama Department of Education guidelines." (Id. at ¶ 22). Consistent with the Student Mobility Policy, transportation is not provided to "students using hardship transfers, majority-to-minority transfers, or the children of school employees attending schools outside of their assigned zones with permission of the District or those who do not reside in Lawrence County." (Joint Report, ¶ 23, March 23, 2009).

Regarding facilities, the Board agreed that it would "initiate a feasibility study for the development of a West Lawrence High School." (Id. at ¶ 28). The study "shall incorporate input from the communities to be affected and its results shall be published for public review." (Id.). The hope of the Board was that West Lawrence High School would be constructed and help further desegregation. However, West Lawrence High School has not been constructed and there is no plan to construct such a high school due to the continued financial struggles of the Board. The 2009 Joint Agreement provided the following if West Lawrence High School was not constructed: "In the event that the District does not secure funding to build a West Lawrence High School within four (4) years (by March 23, 2013), the District will utilize funds in the next facilities plan for expansion of the gymnasium at RAH." (Id. at ¶ 31).

The 2009 Joint Report also required certain improvements to the facilities at RAH and "the Old Courtland High School." (Id. at ¶ 29). These requirements were taken from the 2004 Mediated Agreement. The Board was required to do the following on the campus of RAH: install

adequate lighting outside the gymnasium, repair the football practice fields, install a football field house, install an athletic equipment storage building, inspect and repair the shower facilities at the gymnasium, install a "backstop" on the practice field for use by the baseball and softball tees, and make necessary repairs to the field house at the old Courtland High School. (Id. at ¶ 29 a-f).

For extracurricular activities, the Board agreed that "each high school will have similar extracurricular activities, such as sports teams, academic teams, marching and concert bands, service organizations, honor societies, and social clubs." (Id. at ¶ 33). For curriculum, the Board agreed that the curriculum at all four high schools would be "substantially identical, with emphasis given to courses which address the needs of students who are [on] the Standard Diploma track and the Advanced Diploma track." (Id. at ¶ 34). To accomplish this, the District was allowed to use "distance learning (IVC and IVC COUNTY), computer based instruction (ACCESS), and dual enrollment courses for college credit (DUAL)" to supplement the traditional classroom experience. (Id. at ¶ 35).

## II. THE BOARD'S PLAN

The Board seeks this Court's approval of the closure of RAH effective for the 2022-2023 school year. (Smith Aff., ¶ 5). The students currently attending RAH would be rezoned and would attend either Hatton High School or East Lawrence Middle/High School. (Id.). Along with the proposed school closure, the Board has developed a transition plan for the students at RAH that covers academic supports, extracurricular activities, transportation, faculty/staff assignment, senior privileges, and honorifics. (Id. at ¶¶ 92-93).

While the Board's transition plan is described fully in the affidavit of the District's Superintendent, Dr. Jon Bret Smith, the District has provided a summary of its plans here. The

current RAH faculty will not be laid off, but instead will be split among Hatton High School, East Lawrence Middle School, and East Lawrence High School. (Smith Aff., ¶ 93(e)). These teachers will serve as mentors to RAH students at their school and will be provided an additional pay supplement for their mentor work. (Id. at ¶ 93(a)(iii)). Additionally, the Board plans to support RAH students by having the current RAH counselor split her time between Hatton High School and East Lawrence High School to provide academic and social-emotional supports to RAH students. (Id. at 93(a)(i)). The District's instructional leadership team and local school principals will work together to prepare schedules for all former RAH students that ensure RAH students can continue their current academic plans without any loss of credit or work. (Id. at 93(b)(i)). The Board has committed to providing professional development to the receiving schools on welcoming new students and cultural responsiveness. (Id. at 93(b)(iv)). The District will ensure RAH students are able to immediately participate in any extracurricular or athletic programs at their new schools. (Id. at 93(c)(i)). The District will ensure, for a period of three years, that student leadership clubs at the receiving schools have representation that includes students from RAH. (Id. at 93(c)(iii)). The District has committed to ensuring that bus route times for the former RAH students do not fall outside of expected travel times for students elsewhere in the District. (Id. at 93(d)(ii)). The District also plans to run additional bus routes in the evenings to encourage RAH student participation in extracurricular activities. (Id. at 93(d)(vii)). The Board is committed to ensuring a smooth and successful transition for all RAH students, faculty, and staff.

## III. LEGAL FRAMEWORK

As this Court is well aware, "[t]he Supreme Court's decisions in Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) ("Brown I"), and Brown v. Bd. of Educ., 349

U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) ("Brown II"), placed all *de jure* segregated school systems under a constitutional obligation to desegregate." Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1336-37 (11th Cir. 2005). A non-unitary, former *de jure* segregated school system must not only avoid perpetuating or reestablishing a dual school system, but must also "render decisions that further desegregation and help to eliminate the effects of the previous dual school system." Harris by Harris v. Crenshaw County Sch. Bd., 968 F.2d 1090, 1095 (11th Cir. 1992). On the other hand, "there is no constitutional duty to achieve maximum desegregation." Hull v. Quitman County Bd. Of Educ., 1 F.3d 1450, 1455 (5th Cir. 1993). Courts have "recognized limits imposed upon desegregation efforts by population changes and the reality of white flight, holding that 'school officials who have taken effective action have no affirmative fourteenth-amendment duty to respond to private actions of those who vote with their feet.'" (Id.).

When a school district under a desegregation decree seeks to close a school and reassign its students, as the District does today, the Supreme Court has stated that "it is the responsibility of local authorities and district courts to see to it that future school construction and abandonment are not used and do not serve to perpetuate or re-establish the dual system." Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 21 (1971). The Eleventh Circuit has clarified that "the duty to desegregate is violated if a school board fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities." Harris by Harris v. Crenshaw Cnty. Bd. of Educ., 968 F.2d 1090, 1095 (11th Cir. 1992).

A school closure decision perpetuates or re-establishes the dual system if it "perpetuates or re-establishes schools that are substantially disproportionate in their racial composition; that

is, schools that are substantially disproportionate in their majority to minority students when compared to the proportions of the races in the district as a whole." Lee v. Geneva County Bd. Of Educ., 892 F. Supp. 1387, 1394 (M.D. Ala. 1995). In addition to the impact on student demographics and student assignment, courts have assessed "the proposed consolidation's impact on the Green factors of the school system to see if the consolidation serves to perpetuate or re-establish segregation in these areas." (Id.). This assessment considers the proposed closures impact on faculty, staff, transportation, facilities, and extracurricular activities. Holton, 425 F.3d at 1337 (listing the factors most commonly considered by lower courts in desegregation cases); see also Lee v. Geneva Cnty. Bd. of Educ., 892 F. Supp. 1387, 1394-96 (M.D. Ala. 1995) (considering the impact of a school closure on student assignment, faculty, staff, and transportation).

Beyond the Green factors, courts consider the availability of academic offerings to the students, both at the to-be closed school and the school the students will attend post-closure. See Harris, 968 F.2d at 1095 ("Considering these enrollment figures, the economic strain on the county operating an under-enrolled school, and the increased educational opportunities of a larger school, the Board's decision to consolidate Dozier with Brantley is not only reasonable, but mandated."). Courts also analyze race-neutral justifications for the school closure, such as the condition of the facility to be closed and the economic impact of the closure on the board's finances. See Lee v. Anniston City Sch. System, 737 F.2d 952, 954-55 (11th Cir. 1984) (considering "serious state of disrepair" of the school to-be closed); see also Harris, 968 F.2d at 1092 (considering fact that "due to its small enrollment, the Board spends considerably more per student for teacher salaries at Dozier than at any other school in the system"). Additionally, lower courts have considered whether the proposed plan was adopted in good faith, looking at

whether the school board offered opportunity for public comment and considered other available options. (Id. at 956-57; see also Lee v. United States, 914 F. Supp. at 495-96 (noting that the Board "listened to the concerns of the other parties and the advice offered by the expert presented by the United States")).

Where, as here, a school district proposes to close a school with a predominately Black student body, the school district must "adduce evidence sufficient to support the conclusion that [its] actions were not in fact motivated by racial reasons." Harris, 968 F.2d at 1095 (quoting Arvizu v. Waco Indep. Sch. Dist., 495 F.2d 499, 505 (5th Cir. 1974)). Additionally, "the burden of the closure and relocation cannot be disproportionately placed upon the minority students." Lee v. Geneva County Bd. Of Educ., 892 F. Supp. at 1395.

As this Court is well aware, "the purpose of the court's review is not to substitute its judgment for the school board's, but rather to ensure that the Board has considered the effect of its desegregation plan on minority students and has attempted to distribute that burden equitably." Lee v. United States, 914 F. Supp. 489, 493 (N.D. Ala. 1996). This Court's ultimate responsibility is to determine whether "(1) the plan moves the District towards or away from a dual system; and (2) any burdens brought on by the plan are inequitably borne by African-American students." (Memorandum Opinion, May 8, 2009, p. 21). This Court has previously explained its role in apt terms:

> The court does not sit as a 'super school board' in evaluating the Board's proposal. In other words, the court has neither the authority nor the expertise to decide whether realignment in high school attendance zones will be in the best educational interests of the school children in the Lawrence County school system as a whole. Choices such as that are difficult, and principles of federalism dictate that they must be left in the hands of local educational authorities. As the court has articulated before, the District is not in receivership and the Board is not the ward of the court. The role this court has in this matter is a limited one: it must

answer the question whether proposed actions of the Board comply
with the Consent Decree. It is with that narrow focus in mind that
the court now proceeds to make findings of fact and conclusions of
law.

(See Memorandum Opinion, May 8, 2009, p. 3) (citing Lee, 892 F. Supp. at 1390-91).

## IV.    APPLYING THE LEGAL FRAMEWORK

### A.    The proposed closure of RAH is necessary because of the continued decline in student population and strain on the Board's economic resources.

Since the Board consolidated schools consistent with the 2009 Joint Report, the
population of RAH has consistently declined. (Smith Aff., ¶ 16). The declining student
population in the RAH school zone is not a new trend. (See Doc. 001-69, p. 2) (showing
declining enrollment of Courtland High School and R.A. Hubbard Elementary between 1993 and
2004). Nor is the decline limited only to student populations. (See Smith Aff., ¶¶ 18-19)
(discussing 20% decline in population of District 1, where RAH sits, between 2010 census and
2020 census). For the 2021-2022 school year, RAH had a total student enrollment of 148
students for grades 7-12, or about 24.6 students per grade level. (Id. at ¶ 14).

As student enrollment declines and a school gets smaller, the per pupil cost of operating a
school rises significantly. (Smith Aff., ¶ 36). This is especially true for high schools because of
the many different required courses and additional instructional staff necessary to teach those
courses. For fiscal year 2020, the Board spent $18,030 per pupil at RAH. (Id. at ¶ 37). The per
pupil expenditures at RAH are higher than any other school operated by the Board by a
significant margin. (Id.). When looking at the expenditure of locally generated funds only, the
Board spent $3,525 per pupil at RAH in fiscal year 2020. (Id. at ¶ 39). As a comparison, the
Board spent less than $1,500 per pupil in local funds at each of the Board's three other high
schools. (Id. at ¶¶ 39-40)).

The significant costs to operate RAH as compared to other schools operated by the Board must be viewed in light of the Board's financial struggles. Notably, the Board is funded at the lowest possible level for education: 10 mills county wide. (Id. at ¶¶ 22-35) (discussing the Board's various streams of funding). This Court has previously recognized the Board's financial struggles. (See Memorandum Opinion, p. 20, May 8, 2009) ("The court finds that the Board has reasonably concluded it faces a potential and serious financial crisis, though the court is not prepared to determine the nature and severity of the crisis."). Since this Court's 2009 Memorandum Opinion, the International Paper Mill located in Courtland, Alabama ("Courtland Mill") closed. (Smith Aff., ¶ 30). The Courtland Mill announced its closure in the fall of 2013. (Id. at ¶ 31). The Courtland Mill employed 1,090 people as of June 2013 and its annual payroll was almost $86,000,000. (Id. at ¶ 32).

The Courtland Mill's closure has had a substantial impact on the Board's budget. (Smith Aff., ¶ 30). The value of a mill of ad valorem tax during the Courtland Mill's last year was $478,057.00. (Id. at ¶ 34). The next year, the value of a mill of ad valorem tax plummeted to $260,465.00. (Id.). In the span of one year, the Board suffered a 45.5% reduction in local funds. (Id.). Notably, the value of a mill of ad valorem tax in Lawrence County, Alabama has continued to drop. The fiscal year 2022 mill value was only $239,661.00. (Id. at ¶ 35).

In short, RAH has seen a consistent decline in student population dating back to 2009. The declining student population significantly increases the costs to operate RAH. At the same time, the Courtland Mill closed in 2013 further increasing the loss of population in the Courtland area and strain on the Board's budget. The declining student population and substantial losses in local funding combine to make it no longer economically sound for the Board to continue operating a 7-12 high school that, on average, serves less than 28 students per grade level.

Both the Eleventh Circuit Court of Appeals and Fifth Circuit Court of Appeals have been faced with similar fact patterns to the one presented today by the Board. In <u>Harris by Harris v. Crenshaw County Board of Education</u>, 968 F.2d 1090 (11th Cir. 1992), the Eleventh Circuit approved the closure of Dozier High School, a predominately Black high school in Crenshaw County, Alabama. Like RAH, Dozier High School had experienced significant losses in student population for a number of years. (<u>Id.</u> at 1092-93). For the 1989-90 school year, Dozier High School averaged fewer than 15 students per grade. (<u>Id.</u> at 1092). Additionally, Dozier High School had a student body that "had 70% black students in a county system that had only 36% black students." (<u>Id.</u>). Because of Dozier High School's small size, Dozier offered fewer academic opportunities than a larger school. (<u>Id.</u>). The Crenshaw County Board of Education spent "considerably more" per student at Dozier than at any other school in the system. (<u>Id.</u>). at 1092-93. The Eleventh Circuit concluded that: "[c]onsidering these enrollment figures, the economic strain on the county of operating an under-enrolled school, and the increased educational opportunities of a larger school, the Board's decision to consolidate Dozier with Brantley is not only reasonable, but **mandated**." (<u>Id.</u> at 1095 (emphasis added)).

The Plaintiffs in <u>Harris</u> argued that the Board had taken steps, by approving transfers of White students out of the Dozier zone, that caused Dozier High School's low student enrollment. (<u>Id.</u>). The Board did not deny "historical violations" and admitted that it had permitted transfers "that had a negative effect on desegregation." (<u>Id.</u>). Nonetheless, the Eleventh Circuit determined that the Crenshaw County Board's decision to close Dozier High School was "unavoidable." (<u>Id.</u>). The Court concluded that stopping the closure of Dozier High School in light of the Board's historical violations was not an appropriate remedy. (<u>Id.</u> at 1096-97). The Court found that keeping Dozier High School open as "punishment" for the Board's prior bad faith "would be

at the expense of the children of Crenshaw County." (Id. at 1097). The Court found that the closure of Dozier High School benefitted students because it "makes the best use of limited educational funds, it enhances educational opportunities, and it promoted desegregation." (Id.).

Like the Eleventh Circuit, the Fifth Circuit has approved a school closure under similar circumstances. Hull v. Quitman County Bd. of Educ., 1 F.3d 1450 (5th Cir. 1993). The Quitman County Board of Education sought to close its only remaining predominately White school, Crowder Elementary. (Id. at 1451). Like this case, Crowder Elementary had a declining student population and the Quitman County Board of Education faced "dire fiscal straits." (Id. at 1452). Notably, Crowder Elementary's academic records was "unmatched" in the District with its students performing better than all other students in the district on standardized tests. (Id.). The Fifth Circuit approved of the Board's plan to close Crowder Elementary relying on Harris. (Id.). at 1455-56. Regarding the plaintiff's contention that the Board should have closed a different school despite the 5 year trend in decreased enrollment at Crowder, the Court found that "[t]he school board would have been striking in the dark, at best, to order one of the other three, much larger schools closed and to transfer hundreds of children around the county in the hope that white children would continue to attend an expanded Crowder." (Id. at 1055). Relying on Harris, the Court concluded that "neither there nor here was the board's decision made in defiance of the decree, and in each case it was not economically or educationally sensible to keep a tiny school open." (Id. at 1056).

Here, like in the above cases, RAH is the smallest high school in the District. Because of its small student enrollment, RAH is unable to offer the same number of class offerings and extracurricular opportunities as other high schools in the District. The Board's cost to operate RAH is significantly higher than any other high school, or any school, in the District. Like in

Harris and Hull, the Board's decision to close RAH is not only reasonable, but mandated because of the positive impact on desegregation, increased academic opportunities for students, and promotion of the best use of limited economic resources.

**B.      The proposed closure of RAH does not perpetuate or re-establish the dual school system.**

This Court has previously noted the difficulties for the Board in reaching unitary status in student assignment because of the residential patterns of citizens in Lawrence County. (See Memorandum Opinion, p. 22, May 8, 2009; see also Doc. 001-49, pp. 2-3). The decision to close RAH has a positive impact on the Board's efforts to reach unitary status in student assignment because the closure significantly increases diversity in Hatton High School, East Lawrence High School, and East Lawrence Middle School. Additionally, because closure of RAH does not result in the operation of racially identifiable schools, the closure of RAH does not serve to perpetuate or re-establish the dual school system.

The Board has a student population that is 10% Black and 90% non-Black for the 2021-2022 school year. (Smith Aff., ¶ 14). The student demographics of the Board's middle schools and high schools for the 2021-2022 school year are below:

| | Enrollment | | Demographic Percentages | |
|---|---|---|---|---|
| School | Black | Non-Black | Black | Non-Black |
| East Lawrence Middle | 27 | 373 | 7% | 93% |
| East Lawrence High | 45 | 371 | 11% | 89% |
| Hatton High | 5 | 421 | 1% | 99% |
| Moulton Middle | 32 | 509 | 6% | 94% |
| Lawrence Cnty. High | 37 | 574 | 6% | 94% |
| R.A. Hubbard High | 107 | 41 | 72% | 28% |

(Id.). RAH is the only predominately Black high school or middle school the Board operates. As noted previously, RAH is also the smallest of the Board's middle and high schools. If the Court

approves the closure of RAH, the Board projects the demographics of the remaining schools for the 2022-2023 school year would be similar to the table shared during the December 6, 2021 Board meeting:

| School | Demographic Percentages | |
|---|---|---|
| | Black | Non-Black |
| East Lawrence Middle | 9.5% | 90.5% |
| East Lawrence High | 18.3% | 81.7% |
| Hatton High | 9.3% | 90.7% |
| Moulton Middle | 5.1% | 94.9% |
| Lawrence Cnty. High | 6.0% | 94.0% |
| R.A. Hubbard High | School Closed | |

(Smith Aff., ¶ 87, Exhibit 26). After closing RAH, the diversity at Hatton High, East Lawrence Middle, and East Lawrence High will increase. Importantly, after RAH's closure, the Board will only operate one school, Hazlewood Elementary (approximately 60% Black student population), that has student demographics significantly out of line with the District-wide student demographic percentages.[3]

    "[A] school consolidation proposal that reinforces or creates schools with racial compositions that depart significantly from the district-wide average may be said to perpetuate or re-establish the prior dual system of education." Lee v. Geneva County Bd. of Educ., 892 F. Supp. 1387, 1394 (M.D. Ala. 1995). In Lee v. Geneva County Board of Education, the Geneva County Board of Education sought approval of its plan to cease operating Coffee Springs School. (Id. at 1389-90). In analyzing the impact on student assignment, the court rejected plaintiffs' argument that the closure would result in racially identifiable high schools operated by the board. (Id. at 1395). The Court concluded that "student enrollment at the two receiving high schools will be 17% minority at Samson and 24% minority at Hartford" whereas the District-wide

_____

[3] The Board has no plans to close Hazlewood Elementary School. The Board believes that maintaining an elementary school in the northern part of Lawrence County is critically important at this time.

student demographics were "17% black/1% other/82% white." (Id.). The court determined that "there is absolutely nothing about the Board's proposal which will make any of the schools identifiable as a 'white school' or a 'black school.'" (Id. at 1396). The Court approved of the Board's plan finding it "in no way serve[s] to perpetuate or re-establish the dual system." (Id.).

Here, like in Lee v. Geneva County Board of Education, the closure of RAH will not result in the creation of racially identifiable schools. In fact, the closure of RAH does the exact opposite. Hatton High School's diversity will increase such that its student demographics will almost match the demographics of the District as a whole. The demographics of East Lawrence Middle and East Lawrence High will also improve, creating the most diverse campus in the District. Thus, the closure of RAH does not perpetuate or re-establish the dual school system, and, moreover, it has a positive impact on the Board's efforts to achieve unitary status in the area of student assignment.

**C.      The proposed closure of R.A. Hubbard does not negatively impact any of the Green factors.**

The Board discussed the proposed closure's positive impact on student assignment above in Section V(B). Below, the Board provides an analysis of the proposed closures impact on faculty, staff, extracurricular activities, transportation, and facilities.

The Board expects the proposed closure of RAH to have no impact on faculty and staff. The Bord has committed to not laying off or otherwise terminating the faculty at RAH as a part of this proposed closure. (Smith Aff., ¶ 93(e)(i)). Instead, the current faculty and staff stationed at RAH will be split among the three receiving schools (Hatton High School, East Lawrence Middle School, and East Lawrence High School). (Id. at ¶ 93(a)(ii)). The Board believes that the current RAH faculty and staff will be instrumental in the transition of the current RAH students to their new schools. (Id. At ¶¶ 93(a)(ii); 93(e)(iii)). Additionally, the Board does not expect the

movement of faculty and staff to have any significant impact on the demographics of the faculty and staff at the receiving schools.

Regarding extracurricular activities, the Board expects that the proposed closure of RAH will positively impact, or at minimum, have no negative impact on equitable access to extracurricular activities for students at RAH. The Board has committed to providing former RAH students access to transportation for after-school extracurricular activities. (Smith Aff., ¶ 93(d)(vii)). School buses will run after all after-school practices and meetings have completed. (Id.). This will ensure former RAH students have access to transportation to and from school and from extracurricular activities. Additionally, the Board expects that students will have access to a wider range of extracurricular opportunities at their new schools. (Id. at ¶ 93(c)(iv)). Schools with larger student populations are able to offer higher number of extracurricular opportunities. (Id.); see also Harris by Harris, 968 F.2d at 1092-93. For sports and athletic competitions, the Board will work with the Alabama High School Athletics Association to ensure that RAH students are able to compete at their receiving school without interruption. (Smith Aff., at ¶ 93(c)(i)). Additionally, the Board has committed to ensuring, for a period of three years, that RAH students have an opportunity to participate on student leadership clubs and activities at Hatton High School, East Lawrence Middle School, and East Lawrence High School. (Id. at ¶ 93(c)(iii)).

Regarding transportation, the travel times for bus routes for the former RAH students will not fall outside the expected travel times for students elsewhere in the District. (Id. at ¶ 93(d)(ii)). The Board has traditionally operated four buses running a total of eight routes (four in the morning and four in the afternoon) for students at RAH. (Id. at ¶ 93(d)(i)). For morning routes, the District analyzed bus route times by focusing on the first student picked up by a bus. (Id. at ¶

93(d)(iii)). The District calculated the total time between the pickup of the first student and drop off at school. (Id.). This analysis allows the Court, parties, and community to understand the length of the longest morning bus rides for RAH students. For afternoon routes, the District calculated the total time between when the bus would leave the school and when the last student was dropped off. (Id.). Again, this analysis provides an understanding of the length of the longest afternoon rides for RAH students.

For the 2021-2022 school year, the average student ride time across all 8 RAH bus routes was 38.625 minutes. (Smith Aff., ¶ 93(d)(iv)). The Board projects that, for the 2022-2023 school year with RAH closed, the average student ride time for those same eight routes will increase by 12.875 minutes to 51.5 minutes. (Id.). Of the eight routes, four routes will either have the same ride time or increase by one minute. As shown in the below chart, the remaining four routes will see more significant ride time increases. (Id.).

| Bus Number | Route | Student Ride Time (Minutes) | | |
|---|---|---|---|---|
| | | 2021-2022 SY | 2022-2023 SY | Difference |
| 15.09 | Morning | 42 | 43 | 1 |
| 15.09 | Afternoon | 43 | 43 | 0 |
| 17.15 | Morning | 40 | 40 | 0 |
| 17.15 | Afternoon | 33 | 49 | 16 |
| 12.19 | Morning | 28 | 59 | 31 |
| 12.19 | Afternoon | 24 | 59 | 35 |
| 19.03 | Morning | 56 | 57 | 1 |
| 19.03 | Afternoon | 43 | 62 | 19 |
| Average Student Ride Time | | 38.625 | 51.5 | 12.875 |

With RAH closed, all eight bus routes will have a student ride time between 40 and 62 minutes. (Id. at ¶ 93(d)(v)). This does represent an increase in travel time to and from school for some RAH students. However, despite the increase in travel time, the ride time for RAH students remain consistent with ride times for other students in the District. (Id. at ¶ 93(d)(vi)). For

example, the school campuses at Moulton, East Lawrence, Hatton, Speake, and Mt. Hope all maintain bus routes that have student ride times greater than 40 minutes. (Id.). Because of the geographic size of the District's school zones, bus rides greater than 40 minutes are not uncommon for students. (Id. at ¶ 93(d)(v)). In sum, while RAH students will see an increase in bus travel time, the total increase is not disproportionate and does not create ride times that are inconsistent with bus routes throughout the District.

Finally, the proposed closure of RAH will not negatively impact the facilities factor. The facilities at Hatton High School, East Lawrence High School, and East Lawrence Middle School are comparable in quality to the facilities at RAH.

In sum, the proposed closure of RAH does not negatively impact any of the factors listed in Green. Notably, the proposed closure of RAH has a positive impact on the factors of student assignment and extracurricular activities.

**D.      The proposed closure of RAH does not disproportionately burden Black students and families.**

As discussed above, the closure of RAH will have a substantial, positive impact on desegregation. However, to comply with constitutional mandates, the burden of desegregation must be distributed equitably between Black and White students. See Harris, 968 F.2d at 1097 (considering whether the burden placed on Black students amounted to a "disproportionate burden"). In Harris, the Eleventh Circuit Court of Appeals found that the burden of desegregation was distributed equitably where the closure of a predominately Black school had a significant positive effect on desegregation, there was no reasonable alternative to closing the predominately Black school, and student ride length increased by, at most, ten miles. (Id. at 1097-98).

As in <u>Harris</u>, the closure of RAH will impact Black students more than White students because RAH is a predominately Black school. (<u>Id.</u>). However, like in <u>Harris</u>, the impact on Black students does not amount to a disproportionate burden. (<u>Id.</u>). First, the closure of RAH will have a substantial and positive impact on desegregation, especially in the <u>Green</u> factor of student assignment. Second, the Board has considered alternative plans and was unable to come up with a feasible alternative to closing RAH. (Smith Aff., ¶¶ 94-98). For example, the District considered closing other schools in the District, considered transitioning RAH to a magnet school, and considered the possibility of leaving RAH open. (<u>Id.</u>). However, none of those other options proved workable in light of the District's ongoing financial struggles and declining population in the community surrounding RAH. (<u>Id.</u> at ¶¶ 98-99). Third, as discussed above, the average student ride time, focusing on first on students (for morning routes) and last off students (for afternoon routes), is projected to increase by an average of 12.875 minutes for RAH student routes if RAH is closed. (<u>Id.</u> at ¶ 93(d)(iv)). While it is true that two bus routes will see a ride time increase of more than 30 minutes (31 and 35 minutes), all RAH bus routes are projected to remain within average student ride times for other routes in the District. (<u>Id.</u> at ¶ 93(d)(vi)). In other words, the student ride times for RAH students will not be so great as to create a burden unlike that faced by other students in the District.

Like in <u>Harris</u>, the closure of RAH does not place a disproportionate burden on Black students. In light of the positive impact on desegregation, declining student population at RAH, economic strain on the District, and increased educational opportunities for students, the decision to close RAH is reasonable and does not place a disproportionate burden on Black students.

## V.	CONCLUSION

School closings are always painful and difficult. This is especially true when the closing involves a long-standing neighborhood school that represents the many positive characteristics and qualities of the community that surround it. However, as population shifts occur and financial situations change, school closings are often required. The Board expects Plaintiffs to object to the proposed closure of RAH. However, the essence of Plaintiff's objections lies not in a rejection of a burdensome reassignment plan or fear that former RAH students will be forced to attend deficient schools. Instead, what lies at the heart of Plaintiff's objections is a desire to keep open a neighborhood school that the surrounding community loves and supports. While the communities' love and support for RAH should be commended, it is not a matter that can obstruct the Board's efforts to establish a unitary school system. See Arvizu v. Waco Ind. Sch. Dist., 495 F.2d 499, 504 (5th Cir. 1974) ("student affinity for a school is not a practicality which . . . can vitiate the command for the most effective desegregation decree"); see also Lee v. Geneva County Bd. of Educ., 892 F. Supp. 1387, 1395 (M.D. Ala. 1995) ("It appears the Intervenors' clear interest is in preserving their neighborhood school. While this is an important and understandable interest on the part of Intervenors, unless it is a matter that obstructs the establishment of a unitary school system, it is not a matter that should be taken from the decision-making process of the Board and placed in the hands of a federal court."). For the reasons stated above, the Board moves this Court to approve the proposed closure of RAH.

RESPECTFULLY SUBMITTED this 10 January 2022.

 /s/ Christopher M. Pape
Christopher M. Pape
J. R. Brooks
Zachary B. Roberson
Attorneys for Defendants

<u>CERTIFICATE OF SERVICE</u>

   I certify that I have filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid.

           /s/ Christopher M. Pape
           Christopher M. Pape

OF COUNSEL
LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
Huntsville, AL 35804
Phone: 256-535-1100
Fax: 256-533-9322