FILED
2022 Mar-14 PM 05:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| PATRICIA ANN HORTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | NO. 5:66-cv-0445-RDP |
| | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE COUNTY BOARD OF EDUCATION, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT'S REPLY BRIEF**

The Parties agree on the legal standard applicable to this matter. (See Doc. 37, pp. 11-14). There are three issues with Plaintiffs' Memorandum in Opposition: (1) it is disingenuous for Plaintiffs' to argue that closing R.A. Hubbard High School ("RAH") does not further desegregation; (2) there are no facts to support Plaintiffs' assertion that the Board's decision to close RAH is racially motivated; and (3) Plaintiffs' burden argument focuses too narrowly on RAH without considering the whole of the Board's desegregation plan. This brief will address each of these three problems below.[1]

**I. CLOSURE OF RAH FURTHERS DESEGREGATION.**

Plaintiffs assert that expansion of District 1 is "imminent" and will result in an influx of White students to RAH. (Doc. 49, pp. 8, 15-17). This is incorrect. Plaintiffs confuse school board

---

[1] Plaintiffs reference three personnel matters that are not a part of this action. (Doc. 49, pp. 4-5). The Board notes that, in McElroy v Lawrence County Board of Education, CV-04-2525-NE, the Court dismissed the claims with respect to all but four of the positions at the summary judgment stage. The matter was then resolved prior to going to trial. In Crutch v. Lawrence County Board of Education, et al, the Court dismissed the case, holding that the plaintiff had not presented sufficient evidence of discrimination to overcome the Defendants' Motion for Summary Judgment. See Crutch v. Lawrence County Board of Education, 2014 WL 3889898, *6 (N.D. Ala. Aug. 5, 2014). Dr. Smith, the District's Superintendent, did meet with the local NAACP Chapter regarding Adrian Taylor.

1

member voting lines with school district zone lines. (Smith Supp. Aff., ¶¶ 10-14). There are no additional students being assigned to RAH due to the redrawing of voting districts. (Id. at ¶ 14). As this Court knows, the District would need the Court's approval to change zone lines, and the District has taken no such action. (Id. at ¶ 12).

Plaintiffs characterize RAH as the "most integrated" school and "model for inclusive racial integration." (Doc. 49, pp. 1, 9, 15). This is misleading. RAH has a 72% Black student population. The District as a whole has a student population that is 10% Black. (Doc. 39-3, pp. 1, 14). More than 40% of the District's Black students in grades 7-12 attend RAH. (Id.). RAH's student population is extremely inconsistent with the District-wide student population. Lee v. Geneva Cnty. Bd. of Educ., 892 F. Supp. 1387, 1394 (M.D. Ala. 1995) ("a school consolidation proposal that reinforces or creates schools with racial compositions that depart significantly from the district-wide average may be said to perpetuate or re-establish the prior dual system of education"). The closure of RAH will result in every middle and high school operated by the District having a Black student population that ranges between 5% and 18%. (Doc. 37, p. 19). In other words, all middle and high schools will have student populations that only vary slightly from District-wide student demographics. See Stout by Stout v. Jefferson Cnty. Bd. of Educ., 882 F.3d 988, 1012 (11th Cir. 2018) ("We have criticized 'racially identifiable schools' . . . and explained that courts should consider 'student assignments' when determining whether a school district has fully remedied the effects of *de jure* segregation."); see also U.S. v. Jefferson Cnty. Sch. Dist., 63 F. Supp. 3d 1346, 1350 (N.D. Fla. 2014) ("courts require that formerly segregated school districts strive to allocate students such that the ratio of the races in each school is substantially the same as the ratio of the races in the entire school system"). Private Plaintiffs'

2

position that RAH's closure will not result in further desegregation disregards longstanding student assignment precedent.

## II. NON-DISCRIMINATORY REASONS FOR CLOSURE

The Board provided the Court with multiple non-discriminatory reasons for closing RAH. For example, closing RAH is appropriate because of its declining student population (Doc. 39-1, ¶¶ 15-19). Moreover, the Board offered: financial concerns related to the loss of temporary funding (Doc. 39-1, ¶¶ 28-29), increased academic opportunities for RAH students (Doc. 39-1, ¶ 48), increased extracurricular opportunities for RAH students (Doc. 39-1, ¶ 93(c)(3)(iv)), high per pupil cost to operate RAH as compared to other high schools (Doc. 39-1, ¶¶ 36-40), RAH is the smallest high school operated by the Board (Doc. 39-1, ¶ 15), and the closure places the Board in a better position to achieve unitary status in student assignment (Doc. 39-1, ¶ 60).

In further support of the savings that the Board would reap if it closed RAH, the District offers the affidavit of Suzy Berryman, the Board's Chief School Finance Officer – who has extensive accounting experience. (Berryman Aff., ¶¶ 1-6). Her affidavit explains that the Board would save well over $500,000 annually if it closed RAH. (Id., at ¶¶ 13-18). She calculated the local fund burden (approximately $437,526.30 for 7 more local units) that the District would face in order to staff RAH at the same rate as other high schools (which earn these units from the State of Alabama because of their student population). (Id. at ¶¶ 19-23). Her affidavit also provides a fuller picture as to the impact of the closure of International Paper's mill. (Id. at ¶¶ 24-46).[2]

---

[2] The Superintendent's original affidavit (Doc. 39-1, at ¶¶ 33-35) included a mistaken explanation of the impact on the closure of International Paper's mill on the Board's revenue. The Superintendent's affidavit is correct in that it was substantial, but the logistics of the impact were mistaken. Ms. Berryman's affidavit corrects this mistake and explains the true magnitude of the loss. (Smith Supp. Aff., ¶¶ 43-47); (Berryman Aff., ¶ 44) (explaining the loss was approximately $600,000 in ad valorem revenue and up to $800,000 in sales revenue).

Plaintiffs point out "three significant ways" the Board's reasons are undermined. (Doc. 49, pp. 16-17). First, Plaintiffs argue that the Board is "experiencing the largest budget in its history." (Id. at p. 16). The Plaintiffs ignore that the Board's finances are inflated by a temporary influx of federal and state funds that are either not guaranteed or are set to expire in the coming years. (Berryman Aff., ¶¶ 47-62). For example, Plaintiffs do not account for the Board's recent loss of Simplified Sellers Use Tax funding. (Id. at ¶¶ 50-51). Second, Plaintiffs incorrectly argue that the 2020 census will result in an expansion of District 1 and an influx of White students to RAH. (Doc. 49, p. 16). This is not true. (Smith Supp. Aff., ¶¶ 10-14). As discussed above, District 1 voting lines (not school attendance boundaries lines) were adjusted to comply with federal voting rights laws due to the shrinking population in the Courtland area. (Id.).

Third, Plaintiffs argue that the Board continues to operate other "under-enrolled majority white schools." (Doc. 49, pp. 16-17). This is misleading. First, the Board operates three elementary schools with enrollments under 200: Mt. Hope School (120 students), Hazlewood Elementary School (187 students), and Speake School (188 students). (Doc. 39-1, p. 2; see also Doc. 39-3). Mt. Hope and Speake schools are majority White student populations. (Doc. 39-3, pp. 13, 15). Hazlewood ES has a majority Black student population. (Doc. 39-3, p. 8). Plaintiffs conveniently ignored the Board's continued operation of Hazlewood – likely because Plaintiffs know that Hazlewood, and not RAH, is the appropriate comparator for Mt. Hope and Speake.

Plaintiffs argue that the operation of other under-enrolled White schools dilutes the Board's argument for closure of RAH. (Doc. 49, pp. 16-17). However, Plaintiff's own legal citation does not support its comparison of an elementary school to a high school in a school closure case. See Arvizu v. Waco Indep. Sch. Dist., 495 F.2d 499, 505-506 (5th Cir. 1974). The Arvizu court was careful to only compare schools with the same or similar grade bans. Id. at

505-06. For example, the court found that the capacity issues at Wiley Junior High were paralleled by those at South Junior High. Id. at 505. Similarly, the Court compared the capacity and enrollment at Sanger Avenue Elementary to three other elementary schools - Parkdale, Crestview, and Hillcrest. Id. at 505-06. Nowhere in its opinion did the Arvizu court compare an elementary school to a high school. Id. This makes sense in light of the many differences in cost, operation burdens, and enrollment expectations between high schools and elementary schools. (Smith Supp. Aff., ¶¶ 17-23); (Berryman Aff. ¶¶ 7-12). Plaintiffs own expert acknowledged the differences between a high school and elementary school. (Doc. 49-41, p. 2) ("high schools typically are more expensive than elementary schools due to curriculum differentiation"). In short, the Board's continued operation of Hazlewood, Mt. Hope, and Speake schools is irrelevant to the Court's analysis because they are elementary schools.

## III. BURDENS OF DESEGREGATION

Plaintiffs argue that the closure of RAH will place a "substantial disproportionate burden[] on Black students." (Doc. 49, p. 19). Each of Plaintiffs alleged burdens will be addressed below. Plaintiff's burden analysis falters because it fails to assess the equity of burdens between Black and White students within the full scope of the Board's desegregation plan. Harris by Harris v. Crenshaw Cnty. Bd. of Educ., 968 F.2d 1090, 1097 (11th Cir. 1992) (considering whether burden placed on Black students was equitable or disproportionate). In short, Plaintiffs focus only on the burdens of Black students at RAH without considering the many burdens of desegregation borne by White students in the District as part of the District's whole desegregation plan. Arvizu, 495 F.2d 499 (analyzing burdens in light of whole desegregation plan); Stout v. Jefferson Cnty. Bd. of Educ., 483 F.2d 84, 86 (5th Cir. 1973) (considering burdens placed on students in light of "complex and many-faceted three zone plan"

and approving conversion of predominately Black school "in the context of the whole plan"); Carr v. Montgomery Cnty. Bd. of Educ., 429 F.2d 382 (5th Cir. 1970) (analyzing whole of Board's desegregation plan). In 2009, the Parties agreed to a Joint Report and Consolidation Plan that included the closure of predominately white Mt. Hope High School, predominantly white Speake High School, and predominately Black Hazlewood High School. (Joint Report, May 27, 2009, ¶¶ 6-11). When assessing the burdens of desegregation in light of the Board's whole desegregation plan, including the 2009 consolidation and its ongoing impact, the burden caused by the closure of RAH is not inequitable nor disproportionate.

Plaintiffs state that the closure of RAH will "increase transportation times for Black students." (Doc. 49, p. 20). The Board has previously provided the Court with projected ride time data for RAH students.[3] (Doc. 39-1, ¶ 93d). Plaintiffs' expert did not dispute the Board's data.[4] (Doc. 49-42). Importantly, the ride times for RAH students will remain consistent with ride times experienced by White students in the District. For example, after the 2009 consolidation, students in Mt. Hope were required to ride the bus for significantly increased times to get to Hatton High School. (Smith Supp. Aff., ¶ 30). Currently, bus 17.14 (Mt. Hope to Hatton High) has student ride times of 52 minutes (morning) and 43 minutes (afternoon). (Smith Supp. Aff., ¶ 31). Similarly, Bus 19.01 (Mt. Hope to Hatton High) has student ride times of 59 minutes (morning) and 50 minutes (afternoon). (Id.). After Speake High School (predominantly White) closed in 2009, Speake students experienced increased ride times. (Id. at ¶ 32). Currently, bus 20.02 (Speake to Moulton Middle) has student ride times of 50 minutes (morning) and 52 minutes (afternoon). (Id. at ¶ 33). Similarly, Bus 20.05 (Speake to Lawrence County High) has

---

[3] Plaintiffs fail to acknowledge that four of the eight RAH bus routes will see no or almost no increase in student ride time. (Doc. 39-1, ¶ 93d).
[4] Plaintiffs' expert compared RAH student ride times to travel times for Alabama adults in the workforce. (Doc. 49-42, ¶ 17). This comparison is irrelevant and meaningless. The appropriate comparison for RAH student bus ride times is the ride times for White students attending District schools.

student ride times of 52 minutes (morning) and 43 minutes (afternoon). (Id.). Bus 12.04 (Speake to Lawrence County High) has ride times of 65 minutes (morning) and 65 minutes (afternoon). (Id.). These longer ride times result from the 2009 consolidation and its significant impact on White students. (Id. at ¶ 34). These routes maintain similar, and in some cases longer, ride times to those projected for RAH students traveling to Hatton High. (Id. at ¶ 35). Thus, the ride times for RAH students are equitable when considering that White students have experienced similar ride times since consolidation in 2009. (Id.). It is also not true that Black students are solely shouldering the transportation burden under the whole of the Board's desegregation plan. (Id.); see also Mims v. Duval Cnty. Sch. Bd., 329 F. Supp. 123, 132-33 (M.D. Fla. 1971) (finding that allocation of transportation burdens in school closure case does not have to be one to one between Black and White students).

Plaintiffs assert that the closure of RAH will negatively impact Black students' access to extracurricular activities. (Doc. 49, pp. 20-21). Plaintiffs argue that Black students "will be required to wait around at school until late in the evening until all other extracurricular activities end." (Id. at 21). Plaintiffs' arguments fail to acknowledge two critical facts. First, the schools that will be receiving RAH students complete non-competitive extracurricular activities during the school day. (Smith Supp. Aff., ¶ 36). This is true for this current school year and will be true going forward. (Id.). School leaders build into the school's weekly schedule a set time where students can attend non-competitive extracurricular club meetings. (Id.). Thus, RAH students access to clubs like Future Business Leaders of America, honors societies, and many others will not be impacted by transportation times. For after-school activities, the Board has previously provided the Court information on its plan to provide after-school transportation for RAH students. (Doc. 39-1, ¶ 93(d)(vii)). The Board is willing to run two routes to reduce wait times

7

for students if wait times become an issue. (Smith Supp. Aff., ¶ 38). The second critical fact is that the District did not in 2009, and still does not today, offer extracurricular bus routes for any other student. (Id. at ¶ 35). This benefit would be unique to the former RAH students in order to address concerns of the RAH community. (Id.)

Plaintiffs state that Black students will lose "individualized instruction" at the larger schools. (Doc. 49, p. 20). This is not true. For the 2021-2022 school year, RAH has a student to teacher ratio of 14.29 to 1. (Smith Supp. Aff., ¶ 40). The Board projects that the student-to-teacher ratios at the receiving schools for the 2022-2023 school year to be: East Lawrence Middle at 19.39 to 1; East Lawrence High at 17.75 to 1; and Hatton High at 18.54 to 1. (Id.). RAH students will experience a small increase in student to teacher ratio. (Id.). However, a meta-analysis by Dr. John Hattie found that class size does not have a large impact on student achievement. (Id. at ¶ 41). No school receiving RAH students will have a student to teacher ratio anywhere near a 30-to-1 ratio.

Plaintiffs argue that the Board has failed to show that the closure of RAH will result in "better educational outcomes" for RAH students. (Doc. 49, p. 21). The Board does not have to prove this fact in order to sustain the closure of RAH. However, the Board disputes that RAH "is a model for inclusive racial integration" and "successfully prepares Black students for college and careers." (See Doc. 49, p. 15). Plaintiffs rely only on College and Career Readiness ("CCR") data as evidence that Black students at RAH are college and career ready. (Doc. 49, p. 21). This is a misleading statistic. (Smith Supp. Aff., ¶¶ 24-27). A student may meet the CCR requirement by achieving any one of six indicators of success. (Id. at ¶ 25). One indicator, earning a career tech credential, may be achieved by passing a career technical course, such as a career technical course offered at RAH. (Id. at ¶ 25-26). In the data cited by Plaintiffs, 14 of the 16 RAH students

who achieved the CCR requirement did so through the career tech credential. (Id. at ¶ 26). For the data set cited by Plaintiffs (2021 graduates), RAH had the lowest CCR percentage of any of the Board's four high schools. (Id. at ¶ 26).

A better indicator of academic success and college readiness is the ACT exam. (Smith Supp. Aff., ¶ 27). RAH students have had the lowest ACT composite score average of the Board's high schools for five years in a row. (Id. at ¶¶ 28-29). Black students at East Lawrence High School have outperformed Black students at RAH in four out of the last five years. (Id. at ¶ 29). With that said, the Board must acknowledge that RAH's composite average score has trended up the last two years.[5] (Id.). In 2021, RAH's composite ACT score average, while the lowest, was similar to other high schools in the District.[6] (Id. at ¶ 28).

Plaintiffs argue that the closure of RAH would result in District 1 being the only voting district without a high school. (Doc. 49, pp. 15, 19). This is not true. District 4 also lacks a high school. (Smith Supp. Aff., ¶ 16). Plaintiffs state that closure of RAH will "cause further decline in District 1 population." (Doc. 49, p. 20). While this is irrelevant and speculative, the population of District 1 was in decline before the Board considered closing RAH. (Doc. 39-1, ¶¶ 17-19). Plaintiffs claim that Black students from RAH will experience "racial hostility at the predominately white schools." However, Plaintiffs do not acknowledge the successes minority students have had at Hatton High School, East Lawrence High School, and East Lawrence Middle School. (Smith Supp. Aff., ¶ 7).

---

[5] For Black students, RAH's composite ACT score average was 14.8 in 2017, 14.3 in 2018, 13.9 in 2019, 16.3 in 2020, and 15.9 in 2021. As a comparison, the average composite score for Black students at East Lawrence High School was 17.3 in 2017, 14.9 in 2018, 15.2 in 2019, 16.7 in 2020, and 15.9 in 2021. (Smith Supp. Aff., ¶ 29).
[6] The average composite scores for Board high schools in 2021 were: East Lawrence High School 16.5, Hatton High School 17.1, Lawrence County High School 16.2, and R.A. Hubbard High School 16. (Smith Supp. Aff., ¶ 28).

Plaintiffs have failed to show that the Board has inequitably distributed the burdens of desegregation when considering the whole of the Board's desegregation plan. See Harris, 968 F.2d at 1097.

## IV. COMPLIANCE WITH COURT'S ORDERS

Plaintiffs allege that the District has failed to comply with certain aspects of prior Orders entered by this Court. (Doc. 49, pp. 11-14; 22-23). As it has done in the past, the District disputes these allegations. (See Doc. 18, pp. 5-10). Even if the Court assumes Plaintiffs' statements of noncompliance are accurate, those assertions are inconsequential because the closure of RAH would be justified even if the prior violations had not occurred. Harris, 968 F.2d at 1096. Like in Harris, the alleged prior violations are not the causative factor rendering RAH a non-viable school. In other words, even if the District were able to reverse all of the current effects of its alleged historical violations, the Board could not achieve an enrollment at RAH that is satisfactory from the standpoint either of economics, educational sensibility, or racial integration. Id. at 1096-97. The population in District 1 has declined. (See Doc. 39-1, ¶¶ 17-21). Whether the District did or did not perfectly implement prior Orders of this Court does not change that fact. Nor is the Board's alleged implementation failures the cause of the population decline in District 1. (See id. at ¶¶ 31-32). Further, even assuming the Board has failed to adequately implement the Court's prior Orders, the appropriate remedy is not the continued operation of a tiny high school with a history of declining enrollment. Harris, 968 F.2d at 1097 (noting that keeping Dozier High School open as punishment would be at the expense of the students).[7]

---

[7] Plaintiffs also cite the community's opposition to the closure of RAH. A communities' love and support for a local school is not a matter than can obstruct the Board's efforts to establish a unitary school system. (See Doc. 37, p. 25).

RESPECTFULLY SUBMITTED this 14 March 2022.

      /s/ Christopher M. Pape
Christopher M. Pape
J. R. Brooks
Zachary B. Roberson
Attorneys for Defendants

CERTIFICATE OF SERVICE

I certify that I have filed the foregoing with the Clerk of the Court using the CM/ECF electronic filing system which will send notification of such filing to those parties of record who are registered for electronic filing, and further certify that those parties of record who are not registered for electronic filing have been served by mail by depositing a copy of the same in the United States mail, first class postage prepaid.

/s/ Christopher M. Pape
Christopher M. Pape

OF COUNSEL
LANIER FORD SHAVER & PAYNE, P.C.
P. O. Box 2087
Huntsville, AL 35804
Phone: 256-535-1100
Fax: 256-533-9322