FILED
2022 Apr-25  PM 03:40
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| **PATRICIA A. HORTON, et al.,** } | |
| } | |
| **Plaintiffs,** } | |
| } | |
| **v.** } | **Case No.:  5:66-CV-00445-RDP** |
| } | |
| **LAWRENCE COUNTY BOARD OF** } | |
| **EDUCATION, et al.,** } | |
| } | |
| **Defendants.** } | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on Defendant Lawrence County Board of Education's Motion for Approval of School Closure and Modification of Attendance Zones. (Doc. # 36). The motion is fully briefed (Docs. # 37, 49, 55) and ripe for decision. On April 14, 2022, the court held a hearing on the motion. The court commends counsel for the parties as they were thorough and able in their presentations. After careful consideration, the court concludes Defendant's motion is due to be granted.

## I.      Background

The District has been under the continuing supervision of this court since the court's finding, on September 22, 1966, that the District operated under a dual system of segregated education. (Doc. # 1-3). The District has not obtained unitary (or partial unitary) status, *see Green v. County School Board of New Kent County, Virginia*, 391 U.S. 430 (1968), and the Board notes early in its brief that it is not currently seeking unitary status. (Doc. # 37 at 1). Rather, the Board seeks court approval of its plan to close R.A. Hubbard High School and to modify the student attendance zone boundaries. (*Id.*).

On June 12, 1970, the court ordered the implementation of a plan to convert the District to a unitary system through the creation of school attendance zones. (Doc. # 1-14). The order also required that "[a]ll school construction, school consolidation, and site selection … in the system shall be done in a manner which will prevent the recurrence of the dual school structure once this desegregation plan is implemented." (*Id.* at 7).

Over the past fifty-six years of supervision, the court has been called upon to resolve disputes surrounding requests for multiple school closures and consolidations in Lawrence County. For example, in 1991, the Board sought to close Tennessee Valley Elementary School. (Doc. # 1-55). The Board explained that continuing to operate Tennessee Valley was "economically inefficient [and] academically inadequate" given the outdated facilities and low enrollment. (*Id.* at 2). Plaintiffs consented, and the court authorized the closure of Tennessee Valley. (Doc. # 1-56).

In 2001, the Board sought approval to consolidate R.A. Hubbard Elementary and Courtland High School. (*See* Doc. # 1-57). Plaintiffs initially opposed the consolidation. (*See id.*). But, after conducting limited discovery and a mediation, Plaintiffs and the Board reached an agreement -- which the court approved -- to consolidate the two schools beginning in 2004. (Doc. # 1-77).

In the wake of the economic downturn in 2008-09, the Board sought approval of a comprehensive proposal to consolidate high school attendance zones, close certain schools, and realign grade assignments at certain schools. (*See* May 8, 2009 Memorandum Opinion). Plaintiffs and the Board proposed a Joint Report in which Mt. Hope School would continue to operate as a K-8 school, but students in grades 9-12 would attend Hatton High School; Hazelwood High School would close, and those students would attend R.A. Hubbard High School; and Speake School would continue to operate as a K-8 school, but students in grades 9-12 would attend Lawrence County High School. After considering (1) the plan's effect on moving the District away from a

dual system and (2) whether Black students disproportionately bore the burden of desegregation, the court approved the plan over intervenor objections. (*Id.* at 20-22). The court also noted that:

> the [2009] consolidation efforts are a stepping stone toward consolidating all of the high schools in the western part of the county into a new West Lawrence High School. The parties have indicated (and at present the court agrees) that until such a school is created, it will be extremely difficult (if not impossible) for the Board to seek unitary status with respect to student assignment. The parties are strongly encouraged to take whatever steps are necessary toward achieving that long term goal. However, that issue is not the one facing the court today.

(*Id.* at 22).

The Board filed the current motion seeking approval for the closure of R.A. Hubbard High School and the rezoning of those students to Hatton High School, East Lawrence Middle School, and East Lawrence High School ("the receiving schools"). (Doc. # 37 at 9). Students who live in the pre-2009 Hazelwood High School zone will attend Hatton High School. (Doc. # 39-1 at 19-20). Students who live in the pre-2009 R.A. Hubbard zone will attend either East Lawrence Middle School or East Lawrence High School. (*Id.*).

As part of the Board's transition plan, the current R.A. Hubbard faculty will be assigned to the receiving schools and serve as mentors to former R.A. Hubbard students. (Doc. # 37 at 9-10). Also, to aid the transition, the Board plans to have the current R.A. Hubbard counselor: divide her time between Hatton High School and East Lawrence High School; to provide professional development to the  receiving schools on welcoming new students and cultural responsiveness; to ensure that former R.A. Hubbard students can immediately participate in any extracurricular or athletic program; to ensure (for three years) that student leadership at the receiving schools have representation from former R.A. Hubbard students; to provide similar bus route times as compared to the rest of the District; and to run additional bus routes in the evening for former R.A. Hubbard students participating in extracurricular activities. (*Id.* at 10).

## II.     Legal Standard

When a school system that has not achieved unitary status seeks to close a school and modify attendance zones, the Eleventh Circuit has explained the school system's responsibilities:

> [I]t has an affirmative duty to eliminate the effects of its prior unconstitutional conduct. To fulfill this duty, school officials are obligated not only to avoid any official action that has the effect of perpetuating or reestablishing a dual school system, but also to render decisions that further desegregation and help to eliminate the effects of the previous dual school system. Thus, the duty to desegregate is violated if a school board fails to consider or include the objective of desegregation in decisions regarding the construction and abandonment of school facilities.

*Harris by Harris v. Crenshaw Cty. Bd. of Educ.*, 968 F.2d 1090, 1094-95 (11th Cir. 1992) (citing *Green*, 391 U.S. at 437-38; *Adams v. Board of Public Education*, 770 F.2d 1562, 1565 (11th Cir. 1985)).

Additionally, when the proposal involves the closure of a majority-minority school the Board must "adduce evidence sufficient to support the conclusion that [its] actions were not in fact motivated by racial reasons." *Id.* at 1095 (quoting *Arvizu v. Waco Independent School District*, 495 F.2d 499, 505 (5th Cir.1974)).[1] Further, "the burden of desegregation must be distributed equitably; the burden may not be placed on one racial group." *Id.* at 1097. As another district court aptly summarized the standard:

> [I]f the school board proposes a modification of their desegregation order which involves the closing of a school and the reassignment of its students and faculty, such a petition may be approved if it does not serve to perpetuate or re-establish the dual school system, and if, in the case of a proposed closing of a school with a predominantly minority student body, the board is able to adduce evidence sufficient to support the conclusion that its actions were not in fact motivated by racial reasons and if minority students are not made to bear a disproportionately greater share of the burdens of relocation.

*Lee v. Geneva Cnty. Bd. of Educ.*, 892 F. Supp. 1387, 1395 (M.D. Ala. 1995).

---

[1] The Eleventh Circuit recognizes that Fifth Circuit decisions rendered prior to the close of business on September 30, 1981 are binding precedent. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

## III.    Findings of Fact

The District currently operates twelve traditional schools: East Lawrence Elementary, East Lawrence Middle, East Lawrence High, Hatton Elementary, Hatton High, Hazelwood Elementary, Lawrence County High, Mount Hope Elementary, Moulton Elementary, Moulton Middle, R.A. Hubbard High, and Speake. (Doc. # 39-1 at 2-3). The District also operates two other programs: the Lawrence County Career Technical Center and the Judy Jester Learning Center. (*Id.* at 3).

The District's traditional schools consist of four feeder patterns, which refer to the flow of students from primary-education facilities to secondary-education facilities. (Doc. # 39-1 at 2). First, East Lawrence Elementary and East Lawrence Middle feed to East Lawrence High. (*Id.*). Second, Hatton Elementary and Mount Hope Elementary feed to Hatton High. (*Id.*). Third, Moulton Elementary, Speake, and Moulton Middle feed to Lawrence County High. (*Id.*). Fourth, Hazelwood Elementary feeds to R.A. Hubbard High. *(Id.*).

The current demographics for each school are indicated in the following chart:

| 2021-2022 Student Demographics | | | | | |
|---|---|---|---|---|---|
| **School** | **Numericals** | | **Total** | **Percentages** | |
| | **Black** | **Non-Black** | | **Black** | **Non-Black** |
| East Lawrence Elementary | 54 | 518 | 572 | 9% | 91% |
| East Lawrence High | 45 | 371 | 416 | 11% | 89% |
| East Lawrence Middle | 27 | 373 | 400 | 7% | 93% |
| Hatton Elementary | 6 | 421 | 427 | 1% | 99% |
| Hatton High | 5 | 421 | 426 | 1% | 99% |
| Hazelwood Elementary | 106 | 81 | 187 | 57% | 43% |
| Lawrence County Developmental Center | 2 | 11 | 13 | 15% | 85% |
| Lawrence County High | 37 | 574 | 611 | 6% | 94% |
| Moulton Elementary | 43 | 614 | 657 | 7% | 93% |
| Moulton Middle | 32 | 509 | 541 | 6% | 94% |
| Mount Hope Elementary | 1 | 119 | 120 | 1% | 99% |
| R.A. Hubbard High | 107 | 41 | 148 | 72% | 28% |
| Speake School | 14 | 174 | 188 | 7% | 93% |
| **District Totals:** | **479** | **4227** | **4706** | **10%** | **90%** |

(Doc. # 39-1 at 3). So, at present, the record indicates that the Lawrence County student population is 90% non-Black and 10% Black. (*Id.*). Following the proposed closure of R.A. Hubbard and the modification of attendance zones, the Board projects school assignment in the District's middle schools and high schools as follows:

| School | Demographic Percentages | |
|---|---|---|
| | Black | Non-Black |
| East Lawrence Middle | 9.5% | 90.5% |
| East Lawrence High | 18.3% | 81.7% |
| Hatton High | 9.3% | 90.7% |
| Moulton Middle | 5.1% | 94.9% |
| Lawrence Cnty. High | 6.0% | 94.0% |
| R.A. Hubbard High | School Closed | |

(Doc. # 37 at 19).

The enrollment numbers at R.A. Hubbard have fallen significantly since the 2009 consolidation. (Doc. # 39-1 at 4). In 2009, R.A. Hubbard's enrollment was 323 students but its enrollment for the 2021-2022 school years was 148 students. (*Id.* at 4 n.2). According to the 2010 and 2020 censuses, the populations of Town Creek, North Courtland, Courtland, and Hillsboro (which, except for Hillsboro, encompass the current R.A. Hubbard attendance zone) have also declined from 6,159 residents to 5,064 residents. (*Id.* at 5). The 2013 closure of the International Paper Mill in Courtland played some part in the population decrease, but Plaintiffs also point to other factors, including the closure of Hazelwood High School.

A separate consequence of the International Paper Mill closure was a decrease in local tax revenue. (Doc. # 39-1 at 8). In 2012, the International Paper Mill paid $1,890,575.86 in ad valorem taxes. In 2020, the Mill paid only $130,296.50, which is significant because a third of ad valorem taxes go to funding education in the county. (Doc. # 55-2 at 10). Accordingly, in 2012, the Board

received $630,191.95 in ad valorem revenue as compared to just $43,432.17 in 2020. (*Id.*). The District also saw a significant decline in sales tax revenue after the International Paper Mill closed — a difference of $830,747.52 between the 2013 fiscal year and the 2016 fiscal year. (*Id.* at 10-11).

While the Board currently possesses a strong budget, the Board has indicated that the budget is inflated by revenue streams that it will soon lose. For instance, beginning in fiscal year 2022, the District will lose funding from the state's Simplified Sellers Use Tax ("SSUT"). (*Id.* at 13). The state of Alabama distributes SSUT revenue to counties, which in turn may distribute the SSUT revenue at their discretion. (*Id.*). In 2021, the Lawrence County Commission learned that it is not required to distribute SSUT revenue to the Board. (*Id.*). As a result, the Board is anticipating the loss of this stream of revenue, which amounted to $553,866 in fiscal year 2021. (*Id.*).

The District will also lose funding from federal COVID-19 relief legislation in the year 2024. (*Id.* at 14). In fiscal year 2021, the District's expenditures from federal COVID-19 relief legislation were $2,030,245.69. (*Id.* at 13-16). However, federal COVID-19 relief is set to expire in September 2024. (*Id.* at 14).

R.A. Hubbard is the only high school in the District that operates with fewer than 200 students. (Doc. # 39-1 at 4). The only other three schools that operate below 200 students (Hazelwood, Mount Hope, and Speake) are elementary schools. (*Id.*).

The total per pupil expenditures (which includes federal, state, and local monies) of each traditional school in the District is summarized in the following chart:

| Fiscal Year 2020 | |
|---|---|
| School | Per Pupil Expenditure |
| East Lawrence Middle School | $7,437 |
| Moulton Middle School | $7,311 |
| Hatton Elementary School | $8,933 |
| Hatton High School | $10,070 |
| Lawrence County High School | $10,020 |
| Moulton Elementary School | $10,391 |
| East Lawrence Elementary School | $10,264 |
| Hazlewood Elementary School | $12,811 |
| East Lawrence High School | $12,811 |
| Speake Elementary School | $12,729 |
| Mount Hope School | $13,831 |
| RA Hubbard High School | $18,030 |

(Doc. # 39-1 at 11). More specifically, the per pupil expenditures of *local funds* specific to the District's four high schools is outlined in the following chart:

| Fiscal Year 2020 | |
|---|---|
| School | Per Pupil Expenditure |
| Lawrence County High School | $1,197 |
| East Lawrence High School | $1,377 |
| Hatton High School | $1,461 |
| RA Hubbard High School | $3,525 |

(Doc. # 39-1 at 12). So, it is clear that compared to the other three high schools in the county, the Board has expended more than twice the amounts of local (discretionary) funds on R.A. Hubbard.

8

In fact, 4.1 out of the District's 17.26 local units (that is, 23.8% of the District's local funds) are spent at R.A. Hubbard — a school that serves only 3.15% of the District's students. (Doc. # 55-2 at 4).

On January 25, 2021, the District met with Plaintiffs' representatives for discussions about a plan for the closure of R.A. Hubbard. (Doc. # 39-1 at 16). The District shared its full proposal for closing R.A. Hubbard in a letter dated March 23, 2021. (*Id.*). After several months of correspondence between the District and Plaintiffs, as well as a September site visit at R.A. Hubbard, the District introduced the proposal to close R.A. Hubbard at the November 1, 2021 Board meeting. (*Id.* at 17-19). In the proposal, the District addressed the declining enrollment information, cost per pupil numbers, relevant case law that it would include in its brief for court approval, specifics of the proposed rezoning, and what the resulting demographics of the District's schools would be, among other concerns of the community. (*Id.* at 19-21).

The District presented this information again at the December 6, 2021 Board meeting. (*Id.* at 23). According to the feedback surveys from the community, one of the main concerns was transportation. (*Id.* at 25). The current ride times for students attending R.A. Hubbard are juxtaposed with the expected ride times for those students following the proposed closure of R.A. Hubbard in the following chart:

| Bus Number | Route | Student Ride Time (Minutes) | | |
|:---:|:---:|:---:|:---:|:---:|
| | | 2021-2022 SY | 2022-2023 SY | Difference |
| 15.09 | Morning | 42 | 43 | 1 |
| 15.09 | Afternoon | 43 | 43 | 0 |
| 17.15 | Morning | 40 | 40 | 0 |
| 17.15 | Afternoon | 33 | 49 | 16 |
| 12.19 | Morning | 28 | 59 | 31 |
| 12.19 | Afternoon | 24 | 59 | 35 |
| 19.03 | Morning | 56 | 57 | 1 |
| 19.03 | Afternoon | 43 | 62 | 19 |
| Average Student Ride Time | | 38.625 | 51.5 | 12.875 |

(Doc. # 39-1 at 31). Further, as represented at the hearing, the average ride time in the county is forty minutes.

The District estimates the cost savings of closing R.A. Hubbard and following the proposed plan is $569,000 annually. (Doc. # 55-2 at 4). In addition, if the District were forced to keep R.A. Hubbard open, it would be required to spend an additional $437,500 annually to ensure that R.A. Hubbard's curriculum is comparable to the District's other high schools. (*Id.* at 5). Therefore, the estimated cost of keeping R.A. Hubbard open is over $1 million annually. (*Id.*).

## IV.    Analysis

The court has an important but necessarily circumscribed role when confronted with a motion like this. It is not the court's role to make policy decisions (*i.e.*, to decide how to allocate the District's budget or whether closing a school is in the best interest of the community). To be sure, those policy decisions are emphatically for the elected officials (*i.e.*, the Board) to make, not the court. To be sure, if the court sat as a super school board (and again, to be clear, it does not), it may not have proposed the plan offered here. The court recognizes the concerns of the R.A. Hubbard community, particularly those voiced at the hearing and in the court record, related to the problems and uncertainties of their students moving locations next school year.  However, the

court's narrow role in this case is limited to deciding the following issues: (1) whether the Board's plan reverts the District to a dual system of segregation; (2) whether the Board's decision to close a majority-minority school was racially motivated; and (3) whether Black students bear a disproportionate burden of those proposed desegregation efforts. *Harris*, 968 F.2d at 1097; *Geneva County.*, 892 F. Supp. at 1395. The court addresses each issue below and, after doing so, concludes that the Board's motion is due to be granted.

> **A.      The Proposed Plan Does Not Revert the District to a Dual System of Segregation.**

"[A] critical beginning point is the degree of racial imbalance in the school district, that is to say a comparison of the proportion of majority to minority students in individual schools with the proportions of the races in the district as a whole." *Freeman v. Pitts*, 503 U.S. 467, 474 (1992). "[A] school consolidation proposal that reinforces or creates schools with racial compositions that depart significantly from the district-wide average may be said to perpetuate or re-establish the prior dual system of education." *Geneva County*, 892 F. Supp. at 1394 (noting that the benchmark for this determination is a fifteen-to-twenty percent deviation from the district-wide statistic) (citing *Stell v. Board of Educ. of City of Savannah*, 724 F. Supp. 1384, 1401 (S.D. Ga. 1988), *aff'd*, 888 F.2d 82 (11th Cir.1989)).

Here, the closure of R.A. Hubbard will not revert the District to a dual system of segregation according to school assignment. Indeed, as referenced above, the Board projects the school assignment at the District's middle schools and high schools after the closure of R.A. Hubbard to be:

|  | Demographic Percentages | |
|---|---|---|
| School | Black | Non-Black |
| East Lawrence Middle | 9.5% | 90.5% |
| East Lawrence High | 18.3% | 81.7% |
| Hatton High | 9.3% | 90.7% |
| Moulton Middle | 5.1% | 94.9% |
| Lawrence Cnty. High | 6.0% | 94.0% |
| R.A. Hubbard High | School Closed | |

(Doc. # 37 at 19). When compared to the District's school assignment for the 2021-2022 school year, the proposal increases diversity in East Lawrence High by seven percent and in Hatton High by eight percent (while decreasing diversity in Moulton Middle by one percent). (*Compare* Doc. # 39-1 at 3 *with* Doc. # 37 at 19). More importantly, the proposed modifications do not place the District near the fifteen-to-twenty percent benchmark that would suggest the reestablishment of the prior dual system.[2]

In fact, the proposed realignment actually serves to further balance student assignment in the District. As the Eleventh Circuit reasoned in *Harris* (which is analyzed in more detail below), the closing school had a Black student population that was disproportionately high as compared to other schools in the county, and the receiving school had a Black student population that was disproportionately low. 968 F.2d at 1095. Thus, "combining the two schools … accomplish[ed] greater desegregation." *Id*. Here, R.A. Hubbard currently has a Black student population that is disproportionately high as compared to the other high schools in the county, and Hatton High (one of the receiving schools) currently has a disproportionately low Black student population. Thus, the proposed consolidation plan accomplishes greater desegregation.

---

[2] Regarding the other *Green* factors, the Board provides that the proposed plan will not adversely affect faculty assignment, staff assignment, extracurricular activities, or facilities. (Doc. # 37 at 20-21). And, the court discusses Plaintiffs' concerns about transportation below.

Thus, the court concludes that the proposed plan does not revert the District to a dual system of segregation.

**B.      The Board Has Provided Sufficient Evidence for the Court to Conclude That the Closure is Not Racially Motivated and the Proposed Plan Does Not Place a Disproportionate Burden of Desegregation on Black Students.**

The Board's plan involves closing a school with a majority-minority student population. Accordingly, the Board must provide evidence that (1) the closure of R.A. Hubbard was not racially motivated and (2) the proposed plan does not place a disproportionate burden of desegregation on Black students. *Harris*, 968 F.2d at 1097.

This matter is substantively similar to *Harris*. There, the Crenshaw County Board of Education proposed the closure of a majority-minority school based on a number of factors, including educational opportunities, per student expenditures, declining enrollment, the effect of student-assignment after consolidation, and transportation. *Harris*, 968 F.2d at 1092-93. The court held that after "[c]onsidering the[] enrollment figures, the economic strain on the county of operating an under-enrolled school, and the increased educational opportunities of a larger school, the [school b]oard's decision to consolidate … is not only reasonable, but mandated." *Id.* at 1095.

Here, the Board supports the proposed plan to close R.A. Hubbard and modify the attendance zones pointing to the same factors. As the Board explains, the population in the current R.A. Hubbard zone has decreased nearly twenty percent between the 2010 census and 2020 census. (Doc. # 39-1 at 5). Consequently, from 2009 (the year that Hazelwood High School consolidated) with R.A. Hubbard) to the 2021-2022 school year, enrollment at R.A. Hubbard has declined over fifty percent. (*Id.* at 4 n.2).

As to economic concerns, the Board notes that the total per pupil expenditure at R.A. Hubbard during the 2020 fiscal year was $18,030 while the next highest per pupil expenditure at

another high school was $12,811. (*Id.* at 11). Further, the per pupil expenditures of local funds during the 2020 fiscal year was $3,525 at R.A. Hubbard while the next highest per pupil expenditure of local funds at another high school was only $1,461. (*Id.* at 12). As the Board explains, the high per pupil expenditures at R.A. Hubbard in combination with the decrease in local funding from the closure of the International Paper Mill, the imminent elimination of state SSUT funds, and the impending expiration of federal COVID-19 relief funds represents a threat to the opportunities for all children in the District. Thus, there is sufficient evidence that the Board's proposed plan is financially (not racially) motivated.

Nor does the proposed plan -- especially when viewed in the context of the whole desegregation plan -- place a disproportionate burden of desegregation on Black students. While some (but certainly not all) R.A. Hubbard students will experience longer ride times, those ride times will not be disproportionate when compared to the transportation times of other students in the county. *See Harris*, 968 F.2d at 1093 (comparing the increased ride times to the other bus routes in the county to determine reasonableness). In 2009, the parties agreed -- and the court approved -- the closure of a predominantly Black high school (Hazelwood High School) and two predominantly white high schools (Speake High School and Mt. Hope High School). (*See* May 8, 2009 Memorandum Opinion). The Board explains that ride times increased for white students after the 2009 joint agreement. (Doc. # 55-1 at 7). More importantly, in this instance, when the proposed ride times for former R.A. Hubbard students are compared to other ride times across the county, they are not disproportionate. For example, Bus 17.14 (Mt. Hope to Hatton High) is 52 minutes in the morning and 43 minutes in the afternoon; Bus 19.01 (Mt. Hope to Hatton High) is 59 minutes in the morning and 50 minutes in the afternoon; Bus 20.02 (Speake to Moulton Middle) is 50 minutes in the morning and 52 minutes in the afternoon; Bus 20.05 (Speake to Lawrence County

High) is 52 minutes in the morning and 43 minutes in the afternoon; and Bus 12.04 (Speake to Lawrence County High) is 65 minutes in the morning and 65 minutes in the afternoon. (*Id.* 7-8). The proposed ride times for former R.A. Hubbard students are not significantly higher than the forty-minute average across the District.[3]

In addition, the Board's proposed plan offers several services to offset any perceived burdens on former R.A. Hubbard students. The Board will provide additional bus routes for former R.A. Hubbard students to participate in extra-curricular activities, and it will recruit teachers to tutor/support those students who are waiting for the additional buses after their activities. (Doc. # 39-1 at 32-33). The current R.A. Hubbard counselor will split time between the receiving high schools to provide academic and social/emotional support. (*Id.* at 27). The Board will provide a mentoring program, through which former R.A. Hubbard teachers will support former R.A. Hubbard students at the receiving schools. (*Id.* at 28). The District will ensure that "high-dose" tutors are available to the former R.A. Hubbard students. (*Id.*). The District will make certain that former R.A. Hubbard students can continue their academic plans started at R.A. Hubbard. (*Id.*). The District will provide professional development to the receiving schools on how to welcome new students. (*Id.* at 29). And, the District will ensure, for the next three years, that former R.A. Hubbard students have an opportunity to participate in leadership clubs and activities at the receiving schools. (*Id.* at 30).

---

[3] Plaintiffs also argue that former R.A. Hubbard students will be impacted by a higher student-to-teacher ratio. The Board notes that the current ratio at R.A. Hubbard is 14.29 to 1 while the ratios at the receiving schools will be 19.39 to 1 at East Lawrence Middle School, 17.75 to 1 at East Lawrence High School, and 18.54 to 1 at Hatton High School. (Doc. # 55 at 8). Regardless of the supposed impact of an increase of 14.29 to 19.39 on former R.A. Hubbard students, the student-to-teacher ratio will be the same for every student (not just former R.A. Hubbard students) at the schools at issue. Therefore, Black students will not bear a *disproportionate* burden of desegregation.

Thus, the court concludes that (1) the Board has provided sufficient evidence that the closure of R.A. Hubbard is not racially motivated and (2) the proposed plan does not place a disproportionate burden of desegregation on Black students.

      **C.**    **Plaintiffs' Arguments in Opposition Do Not Justify Denial of the Board's Motion.**

Plaintiffs present three additional points within their argument that the Board has not met its burden to demonstrate that the closure of R.A. Hubbard is not racially motivated. "*First*, Defendants are currently experiencing the largest budget in its history and have a history of being 'financially strong' at least since 2018." (Doc. # 49 at 16) (internal citations omitted) (emphasis in original). "*Second*, the impending redistricting of Lawrence County in response to the 2020 census will expand District 1 to include more white students." (*Id.*) (emphasis in original). "*Third*, Defendants target R.A. Hubbard for closure while continuing to operate other, similarly under-enrolled majority white schools." (*Id.*) (emphasis in original). However, each of these arguments misses the mark.

With respect to the first argument, the Board does not dispute the current status of the budget; however, the Board points out that the imminent loss of state SSUT funds and federal COVID-19 relief funds justify the closure of R.A. Hubbard. The Board contends that now is the right time to close R.A. Hubbard while it has the means -- financial and otherwise -- to assist a smooth transition to the receiving schools. Further, the exact timing of the closure is a policy decision left to the Board, rather than this court.

Regarding the second argument, district-voting lines are not synonymous with school-attendance lines. So, any change in the county's voting districts will not necessarily impact school attendance zones.  Plaintiffs concede this point. (Doc. # 63 at 1).

Finally, regarding the third argument, R.A. Hubbard is the *only high school* that is under-enrolled. The other three under-enrolled schools -- Hazelwood Elementary, Mount Hope, and Speake -- are elementary schools. Given the financial differences between the operation of an elementary school and a high school, the court finds Plaintiffs' third argument unpersuasive.

Plaintiffs also argue that the court should deny the motion to close R.A. Hubbard and modify attendance zones because the Board has failed to comply with the court's previous orders. (Doc. # 49 at 11-14). In particular, Plaintiffs direct the court to what they contend are six failures: (1) Defendants have not provided proof of verifying the residences of five percent of the student body at each school (*Id.* at 11);[4] (2) Defendants have not sufficiently repaired and improved R.A. Hubbard's facilities (*Id.* at 11-13); (3) Defendants have not provided a substantially identical curriculum at R.A. Hubbard (*Id.* at 13); (4) Defendants have not provided similar extracurricular activities (*Id.*); (5) Defendants have failed to hold bi-annual faculty recruitment committee meetings (*Id.* at 13-14); and (6) the proposed plan disproportionately impacts a single community in violation of the 2009 joint agreement (*Id.* at 14).

To be clear, the court does not condone any alleged violation of its previous orders (*i.e.*, the 2009 Joint Agreement, the 2004 Mediated Agreement, and the 2007 Faculty Recruitment Order). However, in the past decade, neither party sought judicial intervention to allow the court to evaluate any purported violation and, as appropriate, granted relief.[5] There is most likely fault

---

[4] Plaintiffs also assert that two white students were granted administrative transfers out of the R.A. Hubbard feeder pattern during the 2019-2020 school year. But, the consideration of those two students does not change the fact that R.A. Hubbard is an under-enrolled school. Nor does the situation of those two students change the per pupil expenditure for R.A. Hubbard because the students were not in high school. (*See* Doc. # 49-27 at 6).

[5] To be clear, the parties last sought judicial intervention in 2012. (Docs. # 18, 19). In their 2012 brief, Plaintiffs expressed concern with the Board's plan to construct a new building at Hatton High School while the facilities at R.A. Hubbard remained inadequate despite the Board's obligations in the 2004 Mediated Agreement and the 2009 Joint Agreement. (Doc. # 19 at 11). Additionally, Plaintiffs expressed concerns with the Board's recruitment and hiring of minority faculty and staff; the Board's supervision of attendance zones; and the District's transportation for Black students. (*Id.* at 15-18).

to be borne by both parties: On one hand, if Plaintiffs had reason to believe that Defendant's continued to violate the court's orders, then Plaintiffs should have filed a motion to seek court enforcement. On the other hand, if the Board believed that it could not abide by the court's orders due to extenuating circumstances (*e.g.*, the decline in population and tax revenue from the closure of the International Paper Mill), then it should have filed a motion seeking a modification of its court-imposed obligations.

Regardless, the *Harris* court has provided guidance on how this court should weigh the alleged violations in relation to the current motion. In *Harris*, the plaintiffs argued that the school board was at fault for the declining enrollment numbers because the school board allowed numerous impermissible transfers of white students. 968 F.2d at 1096. The *Harris* court reasoned:

> [E]ven assuming that requiring [the closing school] remain open is an appropriate "punishment" for the [b]oard's past violations, this "punishment" would be at the expense of the children of [the c]ounty. Operating one school in the southern third of [the c]ounty rather than two is clearly in the best interests of these children because it makes the best use of limited educational funds, it enhances educational opportunities, and it promotes desegregation.

*Id.* at 1097. Similarly, in this case, the Board proposes -- and the court does not find a sufficient reason to disagree -- that the closure of R.A. Hubbard makes the best use of limited educational funds, enhances educational opportunities, and actually promotes desegregation. Thus, even if it could be shown that the Board violated previous orders and/or agreements, rejecting the proposed plan and requiring R.A. Hubbard to remain open would not be the appropriate remedy.

Finally, Plaintiffs' underlying justification for their position in this case bears a striking resemblance to that of the intervenors in *Lee v. Geneva County*: the preservation of their neighborhood school. This court is truly sympathetic to the concerns of the R.A. Hubbard community. The local community loves its school and is understandably proud of it. Grandparents and parents send grandchildren and children to "their school" each morning. However, again, the

court's role is a limited one. This court agrees with the rationale expressed by the *Geneva County* court:

> While this is an important and understandable interest on the part of [Plaintiffs], unless it is a matter that obstructs the establishment of a unitary school system, it is not a matter that should be taken from the decision-making process of the Board and placed in the hands of a federal court.

*Geneva County*, 892 F. Supp. at 1395; *see Arvizu.*, 495 F.2d at 504 ("[I]n the instant case student affinity for a school is not a practicality which … can vitiate the command for the most effective desegregation decree."). Under the narrow questions that this court must review (and in light of the precedent binding on the court), the Board's motion is due to be granted.

## V.    Conclusion

The closure of R.A. Hubbard is a contentious issue in the community. But again, policy decisions (such as the allocation of scarce resources) reside with the Board. The court's narrow role is to determine whether the Board's decision reverts the District to a dual system of segregation, whether the Board's decision to close a majority-minority school was racially motivated, and whether Black students bear a disproportionate burden of desegregation efforts. For the reasons discussed above, the court concludes that Defendant's Motion for Approval of School Closure and Modification of Attendance Zones (Doc. # 36) is due to be granted.

Additionally, the court reiterates that Lawrence County has been under the supervision of this court for nearly fifty-six years. The time is well overdue for the District to move out from this court's supervision. If the District has reached unitary status, then it should seek recognition through court order. However, if the District has not achieved unitary status despite fifty-six years of court supervision, then Defendant and counsel for Plaintiffs shall meet and confer to propose a plan through which Lawrence County will comply with the Supreme Court's mandate in *Green v. County School Board of New Kent County, Virginia* in an appropriate and timely manner.

A separate order in accordance with this memorandum opinion will be entered.

**DONE** and **ORDERED** this April 25, 2022.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE